Filed 11/6/25  P. v. Brashear CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B334538 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.) MA075514 |
| v. | |
| DEMETRIUS KING BRASHEAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Strassner, Judge.  Affirmed.

Elizabeth Richardson-Royer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

While incarcerated, appellant Demetrius Brashear stabbed correctional officer Daniel M.[1] in the head multiple times with an inmate-manufactured weapon.  Prior to trial of the resultant charges, Brashear requested and received discovery of certain confidential personnel records pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).  The trial court denied Brashear's motion in limine to admit expert testimony regarding his diagnosis of post-traumatic stress disorder (PTSD).

Partway through trial, Brashear physically attacked his appointed counsel in front of the jury.  After trial later resumed with replacement counsel, who requested a longer continuance than was granted, the jury found Brashear guilty of most of the charges and found true all aggravating circumstances.

Brashear contends his convictions must be reversed because the trial court erred by excluding his expert testimony and by denying a longer continuance.  He also requests that we independently review the *Pitchess* hearing materials. We grant the unopposed request and find no abuse of discretion in the court's *Pitchess* rulings.  We likewise find no abuse of discretion in the challenged evidentiary and continuance rulings, or any cumulative error.  Accordingly, we affirm.

## PROCEDURAL HISTORY

An amended information filed March 17, 2023 charged Brashear with the willful, deliberate, and premeditated attempted murder of custodial officer Daniel M. (Pen. Code,

---

[1]     We refer to victims by their first names and last initials to protect their privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)

§§ 187, subd. (a), 664)[2]; assault with a deadly weapon upon a custodial officer (§ 245, subd. (c)); assault by a life prisoner (§ 4500); aggravated battery (§ 4501.1, subd. (a)); and custodial possession of a weapon (§ 4502, subd. (a)). The information further alleged that Brashear suffered two prior serious felony convictions (§ 667, subd. (a)) and two prior strike convictions (§§ 667, subd. (b)-(j), 1170.12). It also alleged several circumstances in aggravation (Cal. Rules of Court, rule 4.421).

A jury found Brashear guilty of all charges except the aggravated battery charge, which concerned spitting on correctional officer Yodany S. The jury found not true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation. It found the priors and all aggravating circumstances true.

At sentencing, the court granted Brashear's *Romero*[3] motion to strike his strikes as to the weapon possession count, but denied it as to the other offenses. The court sentenced Brashear to 27 years to life for the assault by a life prisoner, which it designated as the base count, and ordered the sentence to run consecutive to the sentences Brashear was already serving. The court sentenced Brashear to a concurrent term of four years for the weapon possession and imposed and stayed (§ 654) sentences of 25 years to life for the attempted murder and assault on a correctional officer. It struck the prior conviction enhancements in the interest of justice and ordered Brashear to pay various fines and fees.

Brashear timely appealed.

---

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

[3]    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

3

# FACTUAL BACKGROUND

## I. Prosecution Evidence

The California State Prison, Los Angeles County (the prison) is a maximum security prison that houses approximately 3,200 inmates. The prison consists of four "yards" with housing units and other facilities connected by outdoor roadways. Each two-tier housing unit contains 100 two-person cells, a central day room, and a "control booth" from which a correctional officer remotely controls the doors in the unit. Two or three other correctional officers armed with batons, pepper spray, and a pepper spray grenade patrol each housing unit. Both the officers and the inmates are aware that the latter vastly outnumber the former. At the time of the events in this case, the housing units only had surveillance cameras in the visiting areas, and correctional officers were not equipped with body-worn cameras.

In 2017, Lorissa Sanchez was a correctional officer at the prison. On October 20, 2017, she was working as a floor officer when she saw Brashear standing inside the perforated door to his cell, openly masturbating. Sanchez ordered him to stop, but he continued. When she made the order a second time, Brashear turned off the lights inside his cell.

Indecent exposure by inmates is a violation of prison rules and is supposed to be reported to supervisors. After an indecent exposure incident, the inmate is supposed to be removed from his cell, escorted to the medical unit for an evaluation, and then placed in administrative segregation. Inmates are generally aware of these procedures.

Sanchez reported the masturbation incident to her supervisor. She then asked Daniel M. to escort Brashear to the medical unit. Daniel M. testified that the day room was loud and

4

filled with inmates returning from recreational time. He accordingly did not hear the reason for the medical evaluation and did not know that Brashear would be going to administrative segregation. If Daniel M. had known these things, he would have handcuffed Brashear through the food port in his door before opening it.

Instead, Daniel M. testified, he approached Brashear's cell and asked the control booth officer to open the door. Daniel M. testified that Brashear was standing just inside the threshold of the door with his hands behind his back. As the door opened, Daniel M. told Brashear they were going for a medical evaluation. Brashear stared blankly at Daniel M. and did not respond, which Daniel M. found "strange." Brashear then "dropped his left hand down to his side and then immediately, without warning, he jumped up" at Daniel M. Daniel M. noticed a weapon in Brashear's hand and raised his arms to protect his face and neck.

Daniel M. testified that he felt "puncture strikes to the top and the side of my head" and began bleeding "profusely." Daniel M. grabbed Brashear "by the upper torso and took him to the floor." Brashear was on his stomach, and Daniel M. "straddled the back half" of Brashear in an effort to get the weapon and handcuff him. After Brashear refused orders to drop the weapon, Daniel M. pepper sprayed him.

By this point, Daniel M. testified, someone had sounded the housing unit alarm, and other correctional officers including Sanchez responded to the scene. Some of the officers helped Daniel M. up, applied pressure to his wounds, and escorted him to the medical unit for treatment. Photographs of Daniel M.'s injuries were shown to the jury and admitted into evidence.

5

Multiple correctional officers testified that they witnessed the incident and came to Daniel M.'s aid. Sanchez and Victor Alvarado both testified that they saw Brashear "lunge out" of his cell and attack Daniel M. in a stabbing motion. Sanchez sounded her personal alarm and made a radio call of "officer assault" before running to Daniel M.'s aid. Alvarado saw Daniel M. take Brashear to the ground and ran over to help keep him there. Another correctional officer, Teresita Chavez, testified that she saw Brashear "striking" Daniel M. "in his facial area" before she ran to the scene. All three testified that they saw Daniel M. bleeding, and either heard or personally yelled "weapon." Yodany S. testified that he responded to an alarm, saw "a lot of blood everywhere," and "kept hearing things like weapon, weapon, weapon."

Alvarado removed the weapon from Brashear's hand. He described the weapon, which was admitted into evidence, as a "metal rod, approximately two inches, with one end sharpened to a point, blood on it," with a "makeshift handle" made of a rubber band, "paper towels and latex gloves." Chavez focused on putting pressure on Daniel M.'s wounds and escorted him to the medical unit. Yodany S. assisted in handcuffing Brashear, helped him to his feet, and escorted him to the gymnasium for medical assistance. Yodany S. testified that Brashear was "still resistive" and "spat in my face" and "lower torso" on the way to the gymnasium, at which point he knocked Brashear to the ground. Yodany S. "relinquished custody" of Brashear to other officers so he could seek medical attention for the spitting.

The prosecution played a video recording of an interview Brashear had with a prison lieutenant the day of the incident. In that interview, Brashear stated that Sanchez falsely accused him

6

of indecent exposure, "and that's pretty much where it stem from . . . one of the other officers came to extract me from the cell and I refused and it went from there man." When asked to explain, Brashear stated, "He wanted me to cuff up and he open the door and wanted me to cuff up and I refused." Later, Brashear reiterated, "[a]fter I refused he attempted to mace me, and we went from there, you know what I'm saying? We went from there."

## II. Defense Evidence

Carmelo Haynes testified that on October 20, 2017, he was serving time at the prison for attempted murder. Haynes was in his cell when he saw Daniel M. "tap on the door" to Brashear's cell, "go slightly in, and that's when the struggle ensued and all sorts of other stuff like that happened." Haynes could not see into Brashear's cell, which was about 20-30 feet away from his own, but he was able to see "wrestling" before other correctional officers arrived. Brashear "was sprayed. Thrown to the ground and cuffed. . . . [R]oughed up and kicked and hit around a little bit, and things like that." On cross-examination, Haynes said he was "too far away" to see if Daniel M. was injured, and he did not remember seeing blood or pepper spray. Haynes reiterated that the incident began inside the cell, and clarified that he did not know whether Daniel M. or Brashear started it.

Brashear testified that he was convicted of murder in 1989 and had been incarcerated since. He had been transferred to the prison a few months before the incident. Brashear had heard rumors from other inmates that Daniel M. was "bad business," had a temper, and had assaulted inmates in the past.

On October 20, 2017, Brashear was resting or sleeping in his darkened cell when he heard Daniel M. tell the control booth

7

to open the door. Brashear "jumped up" and got an "inmate manufactured weapon" out of his pocket as Daniel M. "came in fast speed." Because it was "not proper protocol for officers to come in while inmates is in the cell," and he had heard rumors about Daniel M., Brashear "felt fear for my life." As Daniel M. advanced toward Brashear, he sprayed Brashear in the face with pepper spray, obscuring his vision. Daniel M.'s other hand was clenched in a fist, and Brashear thought Daniel M. was going to hurt him "real bad," "if not kill me." Brashear accordingly started "swinging back," with the weapon in his hand.

At that point, the altercation moved outside the cell. Daniel M. "bear hugged" and continued to pepper spray Brashear, who testified that he "probably hit him a couple more times while he's more or less holding me." Brashear was trying to get Daniel M. off of him, not kill him. Several correctional officers ran to the scene, the alarm sounded, and "like 20 officers come running in there within 15 seconds." Once the officers realized that Daniel M. was bleeding, they "went to work on me assaulting me and kicking me and all that." Brashear was already on the ground and handcuffed at that point, and he was not resisting the officers.

After a few minutes, Brashear heard a sergeant tell the officers to pick him up. Still "blinded" from the pepper spray, Brashear could not tell who escorted him out of the housing unit, but he believed it was Yodany S. Brashear was handcuffed and had difficulty walking because his ankle was injured. He did not spit on Yodany S. and "couldn't possibly spit on anyone" due to the position in which he was handcuffed. Brashear was treated at the medical unit and was later transported to the hospital,

where he was treated for a broken ankle, "fractured ribs and fractured head."

Correctional counselor David Pixley testified about a separate incident involving Daniel M. On December 16, 2016, he heard a "commotion" outside his prison office. He saw inmate Felipe Diaz "advancing towards three officers," including Daniel M., who were standing in the middle of the day room. After Diaz refused orders to get down, Daniel M. sprayed him twice with pepper spray. Diaz got down on the ground, and Pixley thought "the situation was handled." But Daniel M. walked over to Diaz and kicked him on "the base of the neck and shoulder area." Pixley yelled Daniel M.'s name because it "looked like excessive force or unnecessary force." Daniel M. kicked Diaz once more before stopping. Pixley subsequently talked to Daniel M. about the incident, and Daniel M. told him, "I fucked up." Pixley did not know if Diaz was injured during the incident; he testified that he "saw him walking out" without "limping or blood or injuries."

Diaz testified that he was incarcerated at the prison on December 16, 2016. Daniel M. responded sarcastically when Diaz asked him about the status of some of Diaz's personal property. Daniel M. later opened Diaz's cell door, against policy, and Diaz exited the cell and approached Daniel M. and other officers. Diaz asked Daniel M. about the property again, and added that he had come out of his cell "to show you what I'm about." Daniel M. responded by telling Diaz to turn around and cuff up; Diaz refused. Daniel M. and the other officers pepper sprayed Diaz with "like four bottles of spray" and kicked him after he went down to the ground. Daniel M. continued kicking Diaz in the head until he lost consciousness. At the time of trial, Diaz had a $500,000 lawsuit pending against Daniel M.

9

When recalled by the defense, Daniel M. admitted pepper spraying Diaz and "utiliz[ing] physical force to take him to the ground." Daniel M. testified that he did not kick Diaz, but rather "used the sole of my foot to push him over to the side" because he was "actively resisting." Daniel M. did not recall talking with Pixley about the incident, but testified that it would be "normal" for one officer to "advise" another about reporting use of force.

## DISCUSSION

### I.    PTSD Evidence

#### A.    Background

Prior to trial, Brashear's counsel filed a motion in limine to admit the expert testimony of psychologist Dr. Harry Goldberg, Ph.D. The motion explained:

"Dr. Goldberg is expected to testify that he evaluated Brashear and diagnosed him with PTSD. Dr. Goldberg has the background and experience to explain to the jury what PTSD is and to describe the symptoms associated with the mental illness….

"Furthermore, Dr. Goldberg can note the symptoms present at the time of the incident, such as his believe [sic] that the COs are manipulating him to engage in negative behavior, ongoing nightmares of childhood abuse, and hearing voices of his stepfathers. The voices tell Brashear 'they're coming after you.'

"At the time of the incident, Brashear was convinced that he was being escorted out of his cell because he had falsely been accused of Indecent Exposure and was going to face severe consequences. He also believed that the COs were manipulating him to prevent him from getting released from his long prison sentence. As a result, he took a defensive posture, believing he had to defend himself and use a handmade device to protect

10

himself. Brashear felt he was going to be severely beaten and killed during this incident.

"Brashear's PTSD negates a specific intent to kill and willful, deliberate, premeditation. . . . Brashear's PTSD shows that he was paranoid and after that [*sic*] COs were coming after him and threatening his life. Because he feared for his life, Brashear acted in self-defense. Brashear did not intend to kill any CO, but rather to deter the CO from attacking him via injury."

The prosecution filed a written opposition. Acknowledging that a defendant may "introduce PTSD evidence to negate specific intent," the prosecution argued that Dr. Goldberg instead improperly opined "on defendant's subjective beliefs at the time he 'defended himself. . . .' It's a self-defense opinion, not a specific intent opinion. The problem is that an opinion about defendant's subject [*sic*] state of mind when he acted in self-defense is not admissible. . . . [N]either he, nor Dr. Goldberg, may tell the jury that defendant believed self-defense was necessary because of his PTSD. That is an impermissible 'subjective reason.' It violates the rule that the jury only consider what an objective and reasonable person would do in defendant's position."

At the pretrial hearing on the motion, defense counsel asserted that Dr. Goldberg "could testify to the symptoms that Mr. Brashear was experiencing at the time of the incident." Counsel argued, "if you take on his PTSD, the reason why he had the knife was because . . . he was paranoid. He was afraid that, either of an inmate, or that the CO's [*sic*] were out to get him. So he got the knife to protect himself. . . . [I]t goes towards his specific intent – whether he had the intent to kill or not, I believe that negates that specific intent." The prosecution objected that

11

Dr. Goldberg's report did not actually opine that PTSD negates specific intent. The prosecution argued that Dr. Goldberg instead opined that Brashear "believed he had to defend himself because of PTSD. And that's exactly the kind of thing that the objective standard prohibits."

Defense counsel responded that he was "not going to offer it for self-defense" and "only wanted to introduce his diagnosis of PTSD and what symptoms he observed." Counsel added that "[t]he problem is" that Brashear's previous counsel "only got the competency evaluation" and "did not get a second doctor to address the specific intent issues. . . . So that's why I had to get the doctor that was already appointed, who was Dr. Goldberg, to address the specific intent issue." The court responded, "Which he did not do." Defense counsel agreed, "Right." The court further stated, "He's talking about it in the self-defense sense. He took a defensive posture. He did this to defend himself because he has PTSD. . . . But no one has any documentation to support his mental state at the time – and whether PTSD is even relevant to his mental state with regard to counts 1 and 3 [attempted murder and assault by a life prisoner]."

The court ruled that Dr. Goldberg's opinion was not admissible: "I don't see how Dr. Goldberg addresses his mental disorder of PTSD and how that would be applicable to his mental state at the time, other than how he addresses it in a self-defense situation, which by all accounts everyone is agreeing is not relevant to this case."

### B.    Analysis

Brashear argues that the trial court erred in excluding Dr. Goldberg's testimony. He contends the testimony was "highly relevant" to the issue of imperfect self-defense, could have

12

assisted the jury in assessing his mental state at the time of the crime, and "would have given context, depth, and credibility to Appellant's claim that he believed [Daniel M.] would harm him, and that he acted in order to prevent what he believed was impending harm." He also argues the exclusion of the testimony deprived him of his federal constitutional right to present a complete defense.

"'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'" (*People v. Duong* (2020) 10 Cal.5th 36, 60.) We conclude Brashear has not demonstrated an abuse of discretion here.

Evidence Code section 354, subdivision (a) provides that a judgment will not be reversed based on the erroneous exclusion of evidence unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means" a miscarriage of justice is shown. Thus, as a general rule, "trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 741, 756.)

Trial counsel specifically stated that he was not going to offer Dr. Goldberg's testimony in support of self-defense. Brashear currently argues, however, that the evidence was "highly relevant" to a theory of imperfect self-defense "such that the attempted killing charged in Count 1 would have been reduced to an attempted voluntary manslaughter," and the trial court "much too narrowly construed the potential impact of the

proposed defense." These arguments were not raised below and cannot be raised now.

Similarly, counsel conceded below that Dr. Goldberg's report did not connect the diagnosis of PTSD to specific intent, and that deficiency in the report posed a "problem." We agree. The offer of proof did not, by counsel's own admission, include the opinions that Brashear now argues should have been admitted under authorities such as *People v. Cortes* (2011) 192 Cal.App.4th 873 and *People v. Herrera* (2016) 247 Cal.App.4th 467. Because the desired opinions were not proffered, the court could not fully consider the complex issue of their admissibility under sections 28 and 29.[4] This was not an abuse of the court's discretion, nor is it an issue appropriate for us to visit in the first instance.

## II. Continuance

### A. Background

The incident at the prison occurred on October 20, 2017. The case was initiated in January 2019, and Brashear appeared

---

[4] Section 28 provides in relevant part that evidence of a mental disease, defect, or disorder "is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. (§ 28, subd. (a).) It "shall not be admitted to show or negate the capacity to form any mental state." (*Ibid.*) Section 29 provides, in its entirety, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

14

with his first appointed deputy public defender (DPD) in February 2019.  The initial DPD remained on the case until February 2022, when he was replaced by a second DPD.  On March 7, 2023, the court ruled, apparently for the first time, that no further continuances would be granted in the matter.  The court reiterated its ruling regarding continuances on March 30, 2023.

On May 19, 2023, the court was informed that Brashear's second DPD was being replaced and a third DPD would be ready for trial by July 10, 2023.  The court continued the matter to June 20, 2023.

On June 23, 2023, Brashear's new DPD, Maceo Lewis, filed a motion to continue.  DPD Lewis cited his unfamiliarity with Brashear, whom he met for the first time on June 20, 2023, as well as his unfamiliarity with the "disorganized and unscanned" discovery, his need to interview witnesses, and Brashear's desire to seek mental health diversion.  The court heard and denied the motion for continuance (and request for mental health diversion) on June 27, 2023.  The court noted that the case had been pending for over four years and it had "ordered a long time ago no further continuances."  It concluded that it was "reasonable" for counsel "to get ready in the time frame that we're dealing with." The court trailed the case "within the period" and set the next hearing for July 6, 2023, "with the understanding that it will be sent to [the trial courtroom] for the trial date on the 10th."  The court reiterated in its minute order that no further continuances would be granted.

Jury selection began on July 12, 2023.  Before bringing the prospective jurors into the courtroom, the court advised Brashear that "behaving in court is extremely important" and that trial

15

would proceed in his absence if he did not behave properly. Jury selection proceeded without incident, and the parties delivered their opening statements on July 14, 2023. The prosecution called six witnesses, including Daniel M. and Yodany S.

When trial resumed on July 17, 2023, there was "a disruption in the proceedings" as the prosecution's seventh witness took the stand. According to the trial court's summary, "Mr. Brashear was brought out, he was unhandcuffed. He was not acting up at the moment. We – I indicated to the People to call their next witness. [The prosecutor] indicated who their next witness was and . . . after the witness was indicated to everybody, the court and all, Mr. Brashear lunged out of his chair and lunged to his left all the way across, injuring his attorney, Mr. Lewis, who was bleeding[. Brashear] had to be restrained and taken down after a large struggle right behind the People's table – the prosecution's table. . . . So Mr. Lewis is on his way to the hospital having been injured and bleeding."[5] After the court apologized to, admonished, and excused the jurors, one prosecutor added that "while the incident was going on, the defendant was saying 'we're not going to do this Jim Crow trial.'" The other said she recalled him saying, "'I want a fair trial.'"

On July 24, 2023, Brashear appeared with his fourth DPD, John Henderson. Henderson informed the court that the public defender's office sought to declare a conflict, "not based solely on the battery in court." Noting there had been no basis for a

---

[5] Brashear notes in his opening brief that criminal charges were filed in connection with the incident and remained pending at the time of briefing. He accordingly "in no way concedes the truth, accuracy, or reliability" of the court's or prosecution's summary of the incident.

16

conflict during the preceding six years, the court invited Henderson to disclose further information in camera. Henderson declined and submitted. The court observed that Brashear "brought this upon himself as a delay tactic to get a mistrial" and reasoned that he could not "profit from his own misconduct." The court denied the request to declare a conflict. It nevertheless exercised its discretion to relieve DPD Lewis from representing Brashear. It provided Henderson with reporter's transcripts of the witness testimony and ordered trial to resume on July 31, 2023.

Henderson filed a motion to continue on July 27, 2023. At the July 28, 2023 hearing on that motion, Henderson argued that he needed a continuance because he was "just not ready" for trial.[6] He stated that there was "significant discovery," including "a terabyte USB" of photos and videos, that he needed to review, that he did not have a transcript of the hearing resolving motions in limine, and that an expert witness he wanted to call was not available when trial was set to resume. Henderson asserted he would "be ineffective if we start back on Monday" and requested that the court continue the matter to August 9, 2023.[7]

The court denied the continuance, finding that Henderson had "worked extremely diligently" and "gone at the speed of light to get ready for trial." It also noted that he had the weekend and Monday morning to prepare.

---

[6] He also advised the trial court that this court had denied writ relief on the conflict issue without prejudice.

[7] He also stated, "it would be difficult to get through everything and actually be competent in a year, much less in a couple weeks."

17

Henderson sought writ relief in this court. After we issued a temporary stay, the trial court continued the trial to August 9, 2023, the date Henderson had requested.

On August 7, 2023, Henderson filed a motion to continue the matter "about 30 days out." He also filed a motion for mistrial on the grounds that "no lawyer handling a trial where that lawyer did not see prosecution witnesses testify could competently argue the credibility of those witnesses." The court heard both motions on August 9, 2023. Henderson asserted that he had found "approximately 5,000 pages" of additional records on an internal public defender system but had only been able to get through 700 pages, and had only reviewed the photos on the USB drive. He further sought to "readdress some 402 issues," noting that "Mr. Lewis's defense is not what I plan on offering."

The court denied the motion as unsupported by good cause. It explained, "in summation, the defendant, Mr. Brashear created this issue with his own behavior. The PD's have never been relieved from this case. They've had this case six years and prepped it for trial. Mr. Lewis stepped into this and was ready in three weeks. And we are in the middle of trial, about to finish the prosecution's case-in-chief tomorrow. The defendant doesn't get to benefit from relitigating the issues already litigated and receive a continuance with a fresh set of eyes."

Trial resumed August 10, 2023.

**B.     Analysis**

Brashear contends the trial court abused its discretion by denying a further continuance because Henderson "did not have sufficient time to prepare between July 24, 2023, when he first appeared in court as a representative of the public defender's office, and August 10, 2023, when trial resumed." We disagree.

18

Section 1050, subdivision (e) provides that continuances "shall be granted only upon a showing of good cause." The decision whether to grant a continuance lies within the sound discretion of the trial court. (*People v. Beames* (2007) 40 Cal.4th 907, 920.) There is no mechanical test for determining whether that discretion has been abused. Rather, we consider the totality of the circumstances in the case to determine whether the denial of a continuance was so arbitrary as to deny due process. (*Id.* at pp. 920-921.) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*Id.* at p. 920.)

This case is no exception. The court indicated several times before the courtroom incident that no further continuances would be granted due to the age of the case. It was not an abuse of the court's discretion to stand by those rulings, "particularly when the defendant engages in improper conduct in court. As a matter of policy, a defendant is not permitted to profit from his own misconduct." (*People v. Williams* (1988) 44 Cal.3d 1127, 1156.) Here, "[t]he court had reason to suspect defendant was effectively seeking an indefinite continuance, and it was not required to oblige." (*People v. Pride* (1992) 3 Cal.4th 195, 255.)

After the incident, Henderson requested, and after appellate court intervention received, continuance of the trial to August 9, 2023. That continuance afforded Henderson roughly the same amount of time to get up to speed and prepare for trial that his predecessor Lewis had—and Lewis also filed and litigated motions in limine within that timeframe. The trial court did not abuse its discretion in denying an additional continuance, particularly where the jury had already heard the bulk of the

19

prosecution case and was standing ready to return and resolve the matter.

Brashear suggests "it is hard to imagine" that Henderson "had any kind of defense planned." This suggestion is belied by Henderson's representation to the court that he had assessed and disagreed with Lewis's planned approach and his expressed desire to relitigate certain rulings. It is also belied by Henderson's conduct when trial resumed. Henderson cross-examined the remaining prosecution witnesses, called and examined several defense witnesses, and delivered a closing argument.

Brashear contends he was prejudiced in large part because Henderson "missed the trial testimony of the prosecution's key witnesses" and "was not present at voir dire, so he did not know the jurors, was unaware of how they had been questioned, and felt himself to be at a disadvantage as a result." It is unclear how a continuance of any duration could remedy these concerns; Henderson or any other replacement counsel could not go back in time to the first day of trial. The only practical way to address these concerns would be a mistrial, and Brashear does not argue that his motion for mistrial was improperly denied.

For all these reasons, we conclude the trial court did not err in denying the motion for continuance.

## III. *Pitchess*

Brashear requests that we independently review the *Pitchess* hearings. The Attorney General does not oppose this request. "*Pitchess* rulings are reviewed for abuse of discretion." (*People v. Winbush* (2017) 2 Cal.5th 402, 424.)

"When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must

examine the records in camera to determine if any information should be disclosed." (*People v. Winbush*, *supra*, 2 Cal.5th at p. 424.) At the in camera hearing, "[t]he trial court should . . . make a record of what documents it examined before ruling on the *Pitchess* motion. . . . [T]he court can . . . state for the record what documents it examined." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.) An appellate court independently examines the record made by the trial court "to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

We have reviewed the sealed transcripts of the in camera hearings. We conclude that the court complied with the procedural requirements of a *Pitchess* hearing, including providing an adequate description of the documents it reviewed.

Brashear asks that we also perform an independent review of the *Pitchess* materials themselves to determine whether any disclosures should have been made to the defense. Additional review is not required here. In the transcript of the in camera hearing, the court provided clear, thorough descriptions of each document it reviewed. Where "the court 'state[d] for the record what documents it examined,'" the transcript alone "is adequate for purposes of conducting a meaningful appellate review." *(People v. Myles* (2012) 53 Cal.4th 1181, 1209.) No additional review is necessary, and the trial court did not abuse its discretion.

## IV.    Cumulative Error

Brashear argues that the cumulative effect of the errors asserted in this appeal deprived him of his rights to due process and a fair trial. Having concluded that his contentions

challenging his convictions are without merit, however, we necessarily reject this claim of resultant cumulative error. There was no prejudicial error to accumulate. (*People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

ZUKIN, P. J.

MORI, J.